IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| THE HARLEYSVILLE MUTUAL INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER COGLE, *et al.* <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:09-cv-00830 (AJT/JFA) |

## MEMORANDUM OPINION

The Plaintiff, the Harleysville Mutual Insurance Company ("Harleysville"), has issued certain liability insurance policies (the "Policies" as hereinafter defined) to Cable Protective Services, Inc ("CPS"). An accident occurred on September 20, 2008, near Haymarket, Virginia when a car owned by CPS and driven by Defendant Christopher Cogle ("Cogle"), an employee of CPS, collided with an automobile driven by Defendant Matthew Morrow ("Morrow"). Harleysville has filed this action against Morrow, Cogle, and Defendant Bonnie Harder ("Harder"), who was a passenger in Cogle's vehicle, seeking a declaration that Harleysville has no obligation to indemnify or defend Cogle pursuant to the Policies with respect to claims arising out of the accident. A bench trial was held on April 21, 2010, following which the Court took the matter under advisement.

Upon consideration of all the evidence and the applicable law, as well as the parties' proposed findings of fact and conclusions of law, the Court finds and concludes that at the time of the accident, Cogle was operating his CPS owned vehicle with the permission of CPS and was

therefore an insured under the Policies. Pursuant to Fed. R. Civ. P. 52(a)(1), the Court issues the following findings of fact and conclusions of law.

## I.     <u>Findings of Fact</u>[1]

1. Harleysville is a mutual insurance company licensed to do business in Virginia, with its principal place of business in Pennsylvania. Morrow is a resident of Nokesville, Virginia. Harder is a resident of Halltown, West Virginia. Cogle is a resident of Harpers Ferry, West Virginia. CPS, Cogle's employer, is a Virginia corporation that provides underground utility location services.

2. An accident occurred on Saturday, September 20, 2008 on Route 15 in Prince William County, Virginia, involving a 2008 Smart Car operated by Morrow and a 2008 Kia Rio operated by Cogle, in which Harder was a passenger (the "Accident").

3. At all material times herein, Cogle was employed by CPS, and CPS provided Cogle with a Kia Rio automobile as part of Cogle's employment (the "Vehicle").

4. Harleysville issued to CPS a Commercial Automobile Policy, number BA IM8651, with effective period of May 11, 2008 through May 11, 2009 (the "Auto Policy"), and also a Commercial Liability Umbrella Policy, number IM8651, with effective dates of May 11, 2008 through May 11, 2009 (the "Umbrella Policy"). The Auto Policy and the Umbrella Policy (collectively referred to as "the Policies") provide coverage for the named insured, CPS, as well as anyone using, with CPS's permission, a covered auto that CPS owns or borrows. Auto Policy, Form CA 0001 1001, p. 2 of 11; Umbrella Policy, Form CU 00 01 1201, p. 9.

5. CPS is in the business of locating and marking underground utility lines. For this purpose, CPS has employees known as "locators" who travel in a CPS owned automobile to the

---

[1] The Court makes additional findings of fact, as set forth in Part II, Conclusions of Law.

location where the underground utilities need to be located and marked. Utility companies hire CPS to locate and mark underground utilities; and under Virginia regulations, CPS has, unless it obtains an extension, forty-eight business hours (excluding weekends and state holidays) to locate and mark the utilities after it is requested to do so. CPS performs work throughout Virginia, and each CPS locator is assigned a specific geographic area in the Commonwealth.

6. In the summer of 2008, CPS began hiring locators as employees rather than as independent contractors and began providing the employees with CPS owned vehicles. CPS also drafted a series of guidelines (the "Guidelines") pertaining to the employees' permitted uses for those vehicles. The Guidelines, which were posted on the CPS website accessible by its employees, stated, in pertinent part, that employees were not to allow unauthorized passengers in their company owned vehicles ("no unauthorized passengers!") and were not to operate the vehicles for personal use, including on weekends ("no personal use of the vehicle! (i.e. no driving on the weekend, etc)."). Doc No. 30, "Stipulation" Ex. C.

7. In addition to an automobile, CPS provides its locators with laptop computers that are "linked" together on a wireless network. CPS assigns work to a locator through electronic "tickets" that can be viewed in an electronic "basket" on an employee's laptop. After a locator completes the work assigned to him through the ticket, the locator marks the ticket as completed. CPS can move tickets between the baskets of various locators to ensure that all of the tickets for a day are completed if one locator is unable to complete all of the tickets assigned to him on a given day.

8. Cogle was hired by CPS as a locator on July 14, 2008. Cogle was assigned to Prince William County, Virginia, as his geographic area. As part of his training for the job, Cogle accompanied experienced CPS locators before beginning his work as a locator. Additionally, on

Saturday, July 19, 2008, Cogle met with Brandon King ("King"), the Vice-President of CPS, at the company's headquarters in Chesterfield, Virginia. During that meeting, King reviewed the Guidelines with Cogle. Following that meeting, Cogle received the Vehicle, which he drove back to his home in Harpers Ferry, West Virginia.

9. Tickets for work assignments were often posted in Cogle's electronic basket at the end a work day; and Cogle would typically review those newly assigned tickets after he completed his day's work to ascertain his work assignments for the following day. He also recorded his assignments on paper so he could input those locations into his computer the next morning to obtain computer generated driving directions.

10. Cogle's business routine with respect to the use of the Vehicle was to drive from his home in West Virginia to Prince William County, Virginia, his assigned territory, along Route 15, to an intersection in Haymarket, Virginia (which is located in Prince William County), where he would stop at a gas station or other retail establishment to purchase food or coffee (which CPS permitted), review his tickets for the day, and find his assigned sites through directions on the computer. He would then drive to the various locations of his assigned sites, perform his locator duties, and when he completed his assignments as set forth in his tickets, return to his home in West Virginia. Before the accident, Cogle drove the Vehicle during the weekends on two occasions: on July 19, 2008, when he picked up the Vehicle at CPS headquarters and drove it home, and on August 9, 2008, when he worked at the company's request.

11. On Thursday evening, September 18, 2008, Cogle reviewed the electronic basket on his computer and saw that several tickets had been assigned to him. However, on Friday, September 19, 2008, Cogle did not report for work. Instead, at approximately 6 a.m., Cogle's father called King and informed him that Cogle would be unable to work that day. Without

4

informing Cogle, at approximately 6:30 a.m. Friday morning, King electronically moved all of the tickets in Cogle's computer basket to that of another locator assigned to Prince William County, who completed all of the tickets that had been assigned to Cogle for the day.

12. Cogle did not review his computer basket on Friday, September 19, 2008, and therefore did not know that his assignments for Friday had been re-assigned and completed by another employee. Rather, on Saturday, September 20, 2008, Cogle decided to complete the work that had been assigned to him Thursday evening. However, he and his family had made plans to spend the weekend at Lake Anna, Virginia, at the home of his wife's aunt, Gletia Cook ("Cook"). In order to facilitate that visit and accommodate Cogle's plans to work on Saturday, arrangements were made for Cogle to drive his wife and Harder in the Vehicle to meet Cook at one of his usual stops in Haymarket. Cook would then drive Cogle's wife and Harder back to Cook's home at Lake Anna, while Cogle completed his assigned tickets in Prince William County. After he had completed his work, Cogle planned to drive in the Vehicle, not to his residence, but to Cook's home where he intended to spend the balance of the weekend before returning home on Sunday, September 21, 2008.

13. The Accident occurred on Saturday, September 20, 2010, at approximately 12:11 p.m., when Cogle's Vehicle collided head on with a 2008 Smart Car driven by Matthew Morrow, as Cogle drove along his usual business route on Route 15 from his residence in West Virginia to Haymarket, Virginia, in Prince William County, accompanied in the Vehicle by his wife and Harder.

14. Morrow and Harder have presented claims to Harleysville as a result of the Accident. Harleysville brought this action against Harder, Morrow, and Cogle, seeking a judicial declaration that it is not required to defend or indemnify Cogle for the injuries caused by the

5

Accident because Cogle was not driving with the permission of CPS at the time, as required by the Policies.

15. Harleysville contends that the permission Cogle had to use the Vehicle for business purposes did not extend to his use of the Vehicle on the day of the Accident for four reasons: (1) there were unauthorized passengers, Harder and Cogle's wife Cheryl, in the Vehicle at the time of the Accident; (2) Cogle did not receive approval to work on a Saturday, as company policy requires; (3) Cogle did not, in fact, intend to work on Saturday, September 20, 2008, or alternatively, it was unreasonable for him to think he had work to complete; and (4) even if he intended to work on Saturday, he intended to drive to Lake Anna following the completion of that work and therefore intended to use the Vehicle for personal, not business purposes. Based on all the evidence, the Court makes the following specific findings with respect to these contentions:

    a. Cogle did not have permission to have passengers in his Vehicle at the time of the Accident, as set forth in the Guidelines.

    b. Cogle had express permission to use the Vehicle for business purposes generally. CPS provided Cogle with the Vehicle as part of his employment with CPS and entrusted the Vehicle to Cogle generally without supervision; Cogle was responsible for its use. He was required to retain exclusive physical possession of the Vehicle, seven days a week, 24 hours a day, in order to facilitate his use of the Vehicle for the purposes of his employment.

    c. CPS never prohibited Cogle from using the Vehicle for business purposes on weekends and therefore never qualified the permission given him generally for business use of the Vehicle. The only occasion in evidence when CPS specifically discussed CPS's Vehicle use policy with Cogle was on July 19, 2008, when Cogle made his first, and only visit evidenced in

the record, to CPS headquarters; and it is on this occasion that CPS contends that King informed Cogle of this restriction on Cogle's use of the Vehicle on weekends, even for business purposes. Based on all the evidence, including in particular, the substance of the Guidelines, King's testimony that his conversation with Cogle was based on the language of the Guidelines, the Accident's likely effect on recollections, and the post Accident changes in the CPS vehicle use policy (which included changing the name of the "Guidelines" to "Rules"), the Court finds that while Cogle was informed at the July 19, 2008 meeting that he was prohibited from operating the Vehicle on weekends for personal use, he was not informed, as CPS contends, that the prohibition on weekend personal use also extended to weekend business use. In this regard, the Guidelines, by their terms, do not prohibit all driving on the weekend without express permission, or even business use without prior approval. Rather, they simply state "[n]o personal use of the Vehicle! (i.e. no driving on the weekend, etc)." This statement does not revoke, qualify or restrict the general express permission to Cogle to use the Vehicle for business purposes, as the "no driving on the weekend" language is simply an example of a prohibited personal use, and is consistent with limiting the use of the vehicles to business purposes only. Moreover, the policy regarding weekend work relied upon by CPS was not posted online or otherwise distributed in any written form to Cogle. The policy was not related to concerns over liability arising out of the business use of a vehicle on the weekend, but rather was designed to ensure that King knew the whereabouts of an employee should he receive during the weekend a call from a private landowner attempting to confirm the identity of a locator on his property. For that reason, a discussion with Cogle centered around the restrictions in the Guidelines on personal vehicle use in order to minimize liability would not have logically included a discussion

7

about a company policy that was unrelated to either liability concerns or vehicle safety and upkeep.

        d. Cogle reasonably believed at the time of the Accident that he had a business purpose in using the Vehicle. He reasonably believed that the work assigned to him the previous day remained outstanding; and the Accident occurred on the route that Cogle usually used in connection with his business use of the Vehicle.

        e. At the time of the Accident, Cogle was using the Vehicle for a business purpose related to CPS, as confirmed by, among other evidence, the location of the Accident along his normal business route and the plans he made with his relatives to meet and pick up his wife and Harder at his normal morning business stop in Haymarket.

        f. The Accident occurred while Cogle was engaged in his normal business routine and not while engaged in any non-business use of the Vehicle that he may have contemplated engaging in after he completed his work.

## II. Conclusions of Law

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

2. Harleysville concedes that the Vehicle is a covered automobile under the Policies. The only issue is whether, at the time of the accident, Cogle was using the Vehicle with permission from CPS. That issue is governed by Virginia law.

3. The Virginia Omnibus Statute, Va. Code, § 38.2-2204 (the "Omnibus Statute"), requires every policy of motor vehicle insurance issued in Virginia to insure, in addition to the named insured, "any other persons using or responsible for the use of the motor vehicle . . . with the expressed or implied consent of the named insured, against liability for death or personal

injury sustained . . . as a result of negligence in the operation or use of such vehicle." Va. Code, § 38.2-2204A. This provision is to be applied with an eye to the attainment of its purpose, which is to protect those who are injured by the negligent use of an insured vehicle when operated by another with the permission of the owner. *See Liberty Mutual Insurance Co. v. Tiller*, 189 Va. 544, 53 S.E.2d 814 (1949) (construing former Va. Code § 38-238); *Bernstein v. Nationwide Mut. Ins. Co.*, 458 F.2d 506 (4th Cir. 1972). For these reasons, this statute is to be interpreted liberally in order to effectuate the legislative purpose of broadening automobile liability insurance coverage. *See Gordon v. Liberty Mutual*, 675 F. Supp. 321 (E.D. Va 1987); *Jordan v. Shelby Mutual*, 142 F.2d 52 (4th Cir. 1944); *American Auto Insurance v. Fulcher*, 201 F.2d 752 (4th Cir. 1953). The burden of proof is on the party seeking to bring himself within the Policies' omnibus coverage by proving permissive use. *Hartford Accident & Indemnity Co. v. Peach*, 193 Va. 260, 68 S.E.2d 520 (1952).

4. Under Virginia law, permission to use a vehicle for the purposes of the Omnibus Statute may be either express or implied. Express permission is of an affirmative character and must be directly and distinctly stated and not merely implied or left to inference. *Aetna Casualty & Surety Co. v. Czoka*, 200 Va. 385, 391 (1959). Moreover, "permission to do a specific thing is not permission to do all things." *Sordelett v. Mercer*, 185 Va. 823, 835 (1946). Implied permission, on the other hand, arises from a course of conduct or relationship between the parties in which there is mutual acquiescence or lack of objection to continued use of the vehicle, signifying consent. *Hinton v. Indemnity Ins. Co. of North America*, 175 Va. 205, 214 (1940). Implied permission may arise from a course of conduct between the parties and such permission has a negative rather than an affirmative implication; that is, an impliedly permitted act may be

9

one that is not specifically prohibited, as opposed to an act that is affirmatively and specifically authorized. *Coureas v. Allstate Ins. Co.*, 198 Va. 77 (1956).

5. In its interpretation and application of the Omnibus Statute, the Virginia Supreme Court has recognized the distinction between the use of a vehicle in an "unauthorized manner of operation" (i.e. driving drunk in violation of specific instructions to remain sober while driving), and its use for an improper or unauthorized purpose (i.e. such as driving for personal use when the scope of the permission explicitly only allows driving for business purposes). The Virginia Supreme Court has also has held that the manner in which a driver operates his automobile, even if in violation of the owner's rules or policies, does not vitiate permission that otherwise exits for its use. *See City of Norfolk v. Ingram*, 235 Va. 433, 437 (1988) (holding that the owner's permission for business use was not negated by the driver's impermissible, intoxicated manner of operation). However, the Court has found no instance of a Virginia state court considering whether the transportation of unauthorized passengers constitutes a "manner of operation" that does not negate permission, as opposed to the use of the vehicle for an unauthorized purpose, which does. The Fourth Circuit, in dicta in a case that preceded the Virginia Supreme Court's decision in *City of Norflok v. Ingram*, opined that the presence of unauthorized passengers does not negate permission. *See Jordan v. Shelby Mut. Plate Glass & Casualty Co.*, 142 F.2d 52, 56 (4th Cir. 1944) ("[W]e think the coverage of the 'omnibus clause' would have attached, though [the driver] carried a rider contrary to his employer's instructions."). Nevertheless, this Court must predict what legal effect the Virginia Supreme Court would ascribe, based on the facts of

.

this case, to the presence of unauthorized passengers for the purposes of the Policies and the Omnibus Statute on the facts of this case.[2]

6. The rule of construction embodied in Virginia's distinction between an unauthorized manner of a vehicle's operation and a use whose purpose is unauthorized reflects an expansive and more liberal interpretation of "permission" under the Omnibus Statute than other tests that some courts have adopted. *Compare Rhodes v. Ocean Acci. Guarantee Corp.*, 239 A.D. 92 , 94 (N.Y. App. Div. 1933) (adopting a "strict construction" test with regard to unauthorized passengers) and *Reisch v. M & D Terminals*, 180 Ariz. 356, 363-64 (Ariz. Ct. App. 1994) (adopting a "minor deviation rule" with regard to unauthorized passengers). The adoption of this rule in Virginia reflects the underlying public policy of the Omnibus Statute to expand the availability of insurance to those who are injured. In considering this issue, the Court also notes that regardless of what test a court uses, a majority of jurisdictions that have considered the effect of unauthorized passengers on permission have held that unauthorized passengers do not negate coverage. *See* 8 Appleman, Insurance Law and Practice, § 4370, at 332. In addition, courts that have adopted as the test whether the violated rule relates to the manner of operating the vehicle, as opposed to the use for which it was being operated, have concluded that violating a "no passengers" rule relates to the manner of operation and not the purpose for which it is being used and have refused to negate an otherwise permitted use on that basis. *See, e.g., Travelers Indem. Co. v. Federal Ins. Co.*, 297 F. Supp. 1346, 1349 (N.D. Ga. 1969) ("[D]espite violation of the no-passenger rule, the vehicle is still employed for its permitted purpose . . . . [C]overage under omnibuses clauses [is] upheld where vehicles were used for their permitted purpose, but were operated in express violation of orders.") (citing *Strickland v. Georgia*

---

[2] Some courts have aptly referred to this exercise as the "Erie guess." *See Cooper v. Laboratory Corp. of Am. Holdings*, 150 F.3d 376, 380 (4th Cir. 1998).

11

*Casualty & Surety Co.*, 224 Ga. 487 (1968)). For these reasons, the Court concludes that the Virginia Supreme Court, if presented with this issue, would find, on the facts of this case, that the presence of Harder and Cheryl Cogle in the Vehicle when the Accident occurred does not negate the permission Cogle otherwise had at the time of the Accident to operate the Vehicle for business purposes.[3]

7. Cogle's intention to use the Vehicle to travel to Lake Anna after he completed his work is legally irrelevant and does not provide any basis to void coverage under the Policies since the Accident occurred while he was in fact pursuing his employer's business. *See City of Norfolk*, 235 Va. at 436 (holding that when the accident occurred on the route mandated by a business purpose, other deviations from that route were not material to whether there was permission.) [4]

8. Cogle had an objectively reasonable basis for believing he was operating the Vehicle for a business purpose and therefore was operating the Vehicle within the scope of permission he had received from CPS. He reasonably believed that the work assigned to him to complete the

---

[3] In reaching this conclusion, the Court has considered the case of *Liberty Mut. Ins. Co. v. Venable*, 194 Va. 357, 365 (1952), decided approximately thirty-five years before *Ingram* and relied on by Harleysville. In *Venable*, the issue was whether a driver of a company owned truck was engaged in a permitted use at the time of an accident when, at the time of the accident, the driver was accompanied by passengers in violation of a company rule. At trial, the driver testified that he had never been told not to pick up passengers and the trial court excluded evidence of a written statement by the driver in which he admitted that he had been expressly told not to pick up passengers, but did anyway. Reversing the decision of the trial court that the driver was operating the vehicle with permission under an older codification of the Omnibus Statute, the Virginia Supreme Court held only that such impeachment evidence was material and should have been admitted. The Court did not consider whether the violation of the no passenger rule would preclude a finding of permitted use. No necessary view or inference on that issue can be drawn from the Court's ruling or opinion since the overall credibility of the driver was obviously in issue and may have affected any number of issues at trial.

[4] The Court does not express any opinion on whether Cogle's use of the Vehicle to join his family at Lake Anna after he completed his work , had it occurred, would have violated CPS's policy prohibiting personal use or whether it would have been within the scope of his permitted use of the Vehicle to return home at the end of a work day.

12

previous day remained outstanding; and the Accident occurred on the route that Cogle usually used in connection with his business use of the Vehicle. Under the facts of this case, CPS's policy with respect to weekend work did not restrict Cogle's permitted use of the Vehicle for business purposes on the day of the Accident.

9. For the above reasons, the Court finds and concludes that Cogle was operating the Vehicle with permission when the Accident occurred and that he is an insured under the Policies with respect to the Accident.

An appropriate Order will issue.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
May 18, 2010